FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
★ FEB 27 2015 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA,

- v. -

MARK HENRY,
    also known as "Weida Zheng,"
    "Scott Russel,"
    "Bob Wilson," and
    "Joanna Zhong,"

                       Defendant.
------------------------------------------------------------X

**MEMORANDUM AND ORDER**
13-CR-91 (RRM)

ROSLYNN R. MAUSKOPF, United States District Judge.

       On July 2, 2014, a jury convicted defendant Mark Henry of unlawfully exporting military equipment to Taiwan, and conspiring to do the same. He has asked for a new trial, arguing that the government denied him his right to a fair trial by improperly and excessively referring to his "lies" in its closing argument. He also argues that his counsel's failure to object to the closing argument was unreasonable and prejudicial. Because the government's summation was not improper, Henry's motion is **DENIED**.

## BACKGROUND

       Henry was tried on charges contained in an Indictment (the "Indictment") filed on February 13, 2013. According to the facts set forth in the Indictment, Henry operated an export company from April 2009 to May 2012 known as Dahua Electronics Corporation, or, alternately, as Bao An Corporation (the "Export Company"). The Indictment alleged that through the Export Company, Henry purchased ablative material[1] from a company in Colorado and had it shipped to

---

[1] Ablative material is a protective substance that absorbs heat in high-velocity and high-intensity heat environments. The ablative material that Henry exported could be used as a heat shield to prevent rockets or missiles from melting upon their launch, and is classified by the federal government as "significant military equipment."

a Taiwanese company. Because this material was listed on the United States Munitions List, anyone who wished to export it was first required to obtain a license or written authorization from the State Department, pursuant to the Arms Export Control Act (the "AECA"). Henry did not do so. The Indictment charged him with one count of conspiring to violate the AECA, and one count of violating the AECA. It also charged him with attempting to violate the International Emergency Economic Powers Act (the "IEEPA"), alleging that he tried to unlawfully export "dual use" items (items with both military and non-military uses) to China without a license from the Department of Commerce.

Henry's trial began on June 23, 2014, and the jury found him guilty of conspiring to violate the AECA and of violating the AECA on July 2, 2014. The jury found him not guilty of the third count – attempting to violate the IEEPA.

At trial, the government's evidence established that Henry ordered tens of thousands of dollars' worth of ablative material from a Colorado distributor on at least four occasions, acting under his true name for some transactions and an alias for others. The export license requirement was expressly displayed on numerous transaction records, and was discussed in email exchanges between Henry and his customer in Taiwan, Fortune Tell Ltd. ("Fortune Tell"). When he sent Fortune Tell the ablative material, Henry created false invoices and shipping labels describing the package contents as "silicone grease." One email between Henry and Fortune Tell discussed the effectiveness of this false description, while a different email specifically mentioned Taiwan's military as the customer.

Also introduced into evidence were statements that Henry made about his export business in an interview with law enforcement officers on May 1, 2012. In that interview, Henry admitted using several fake names to operate the Export Company. He acknowledged that he had never

2

applied for an export license from the State Department or the Department of Commerce, but claimed that he never placed orders when he was told an export license was required. He nonetheless admitted sending ablative materials to Taiwan, although he maintained that the military was not the end-user.

Henry put forward a defense case, which accounted for a substantial portion of the seven-day trial. Henry first called his father, Xinhao Zheng, to the witness stand. Zheng's testimony focused on the assistance he provided to Henry with his export business while Henry suffered through a divorce. Zheng claimed that he, not Henry, had exchanged emails with Fortune Tell discussing export licenses, and that he had authored the inculpatory emails in Henry's name. However, Zheng could not explain, among other basic business processes, how he found suppliers for the Export Company. Henry then testified in his own defense. He admitted to falsely labeling packages, including describing the ablative materials as silicone grease, but said he did so only to help Fortune Tell avoid import taxes. He claimed that he had not read any of the critical emails discussing export license requirements, and that his father had written all of the inculpatory emails from Henry's account.

In its summation, the government focused on the discrepancies between Henry's testimony and the documentary exhibits, as well as the fundamentally implausible nature of his account. The government referred repeatedly to his lies; those he told on the stand and those that pervaded the conduct of his business. Defense counsel did not lodge a single objection to the government's summation.

Henry filed his motion for a new trial on August 1, 2014, and the government filed its opposition on September 5, 2014.

3

## LEGAL STANDARD

Federal Rule of Criminal Procedure 33(a) provides that a "court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). In evaluating a Rule 33 motion, the Court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). Rule 33 grants courts "broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Polouizzi*, 564 F.3d 149, 159 (2d Cir. 2009) (internal quotation omitted). However, the defendant "bears the burden of proving that he is entitled to a new trial under Rule 33." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (internal quotation omitted). To grant a new trial under Rule 33, a district court must be satisfied that "letting a guilty verdict stand would be a manifest injustice." *Ferguson*, 246 F.3d at 133. A new trial should not be granted when the court is "satisfied that competent, satisfactory, and sufficient evidence in the record supports the jury verdict." *Id.* at 134. Given the stringency of this standard, "motions for a new trial are disfavored in this Circuit," *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), and Rule 33 motions are granted only "sparingly and in only the most extraordinary circumstances." *Ferguson*, 246 F.3d at 134.

When a defendant asserts that a prosecutor's improper remarks are the sole basis for a new trial, he faces an even greater challenge. "Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding." *United States v. Elias*, 285 F.3d 183, 190 (2d Cir. 2002) (citation and internal quotation omitted). To warrant reversal, the defendant must show that the misconduct was "so severe and significant as to result in the denial of [his] right to a fair trial."

4

*United States v. Loscascio*, 6 F.3d 924, 945 (2d Cir. 1993). The remarks must "so infect the trial with unfairness as to make the resulting conviction a denial of due process," *United States v. Coriaty*, 300 F.3d 244, 255 (2d Cir. 2002), and prosecutorial comments will not amount to a denial of due process unless they cause the defendant "substantial prejudice," and therefore constitute "egregious misconduct." *United States v. Shareef*, 190 F.3d 71, 78 (2d Cir. 1999) (citation and internal quotation omitted). To evaluate whether prosecutorial misconduct resulted in a denial of due process, the Court considers "the severity of the misconduct, the measures adopted to cure it, and the certainty of conviction in the absence of the misconduct." *Shareef*, 190 F.3d at 78.

## DISCUSSION

Henry seeks a new trial on the ground that the prosecutor's use of the words "liar" and "lie" at summation was excessive and inflammatory, and thus denied him due process and a fair trial. He repeatedly notes that some form of the word was used 55 times, and offers that such usage was flagrant abuse made solely to inflame the passion of the jurors. However, these same remarks did not provoke defendant or defendant's counsel to raise a single timely objection at trial, nor to ask for a jury instruction to cure any alleged prejudice.[2] The Court finds that the remarks fell far short of the demanding standard described above, and did not require any curative measures. By testifying in his own defense, Henry injected his credibility directly into the trial, and thereby made his truthfulness a central question for the jury. The government had no choice but to address his testimony, and, accordingly, his credibility. Further, the manner in which it did so was proper. Many of the allegedly objectionable comments were

---

[2] As the government points out, since defense counsel did not object to the remarks – which, as addressed *infra*, Henry ascribes to ineffective assistance of counsel – reversal would be warranted "only where the remarks amounted to a flagrant abuse." *United States v. Germosen*, 139 F.3d 120, 128 (2d Cir. 1998) (internal citation and quotation omitted). Because the Court finds that the remarks here did not cause "substantial prejudice," *Shareef*, 190 F.3d at 78, any consideration of whether the remarks met the higher standard of a "flagrant abuse" is moot.

characterizations of Henry's disputed testimony, while others were made to highlight documentary evidence that contradicted Henry's explanations. The comments were not made carelessly or haphazardly, and they did not unnecessarily attack Henry personally. Despite their repetitive nature, the comments did not stray outside the "broad leeway" granted to prosecutors during summation.[3] *United States v. Edwards,* 342 F.3d 168, 181 (2d Cir. 2003). Moreover, even supposing the prosecutor's comments had been improper, the weight of evidence clearly indicates that Henry would have been convicted absent any such impropriety.

## A. Severity of Misconduct

Because there was no question that Henry failed to obtain the requisite license before exporting the ablative material to Taiwan, the trial focused on whether or not Henry *knew* that he needed to obtain a license to export that material. In his testimony, Henry admitted falsely labeling the ablative materials as "silicone grease," (Tr. 784), and even admitted handling emails with Fortune Tell that included explicit export license warnings. (Tr. 961, 974–78.) However, Henry claimed that he had not read inculpatory emails in which Fortune Tell expressly informed him of the export license requirement, directed him not to pursue the license, instructed him to remove the identifying labels from the ablative material, and told him to ship the materials without the license. (Tr. 770–87.) Incapable of accounting for the even more damning email exchanges in which *he himself* specifically referred to the export requirement, Henry maintained that his father, Zheng, wrote the incriminating messages. (*Id.*) While Zheng superficially corroborated Henry's story on this point, his testimony was beyond reasonable belief. For example, Zheng could not even recall the email address from which he purportedly wrote those messages. (Tr. 718.) Zheng also required a Chinese interpreter at trial, and struggled even to

---

[3] Henry does not argue that the prosecutor engaged in any misconduct other than at summation. Even assuming, for argument's sake, that the prosecutor's comments at summation constituted severe misconduct, they were "an aberration in an otherwise fair proceeding." *Elias,* 285 F.3d at 191.

6

read aloud emails, written in English, that he claimed to have authored. (Tr. 1097–1100.) This unlikely story typified the far-fetched nature of Henry's overall defense. Indeed, Henry's testimony, which spanned approximately 300 pages (constituting nearly a third of all the trial testimony), was discredited in various other ways through cross-examination, the government's extensive documentary evidence, and often common sense.[4]

In light of his testimony and other aspects of his defense case, Henry put his credibility squarely in the purview of the jury. The government was entitled, if not obligated, to address the numerous ways in which his case failed to comport with, or, in many cases, was flat-out contradicted by, the weight of the evidence. Under these circumstances, it was entirely appropriate for the government to address the truthfulness of Henry's case at summation. *See United States v. Peterson*, 808 F.2d 969, 977 (2d Cir. 1987) (holding that addressing a witness's credibility where that credibility is clearly at issue is not improper); *United States v. Durrani*, 835 F.2d 410, 424 (2d Cir. 1987) (finding that defendant's credibility "became a matter for the jury when he took the witness stand," and that prosecutor's comments regarding its implausibility were not error).

What's more, the manner in which the government addressed the defense case fell well within the "broad leeway" accorded prosecutors at summation. Prosecutors, after all, are not precluded from "vigorous advocacy," or from using "colorful adjectives." *United States v. Jaswal*, 47 F.3d 539, 544 (2d Cir. 1995) (citation and internal quotation omitted). With respect to prosecutorial comments about the credibility of witnesses, including testifying defendants, the Second Circuit has frequently upheld convictions after summations that included negative

---

[4] The Court will not attempt to enumerate each instance where Henry's testimony directly conflicted with other credible evidence. The government correctly notes several such occasions in its responsive submission, including Henry's false claims that he first learned about export licenses at a seminar in June 2012, and that he did not understand English well enough to comprehend the export rules.

7

characterizations of witness credibility. *See Coriaty*, 300 F.3d at 255. Specifically, "[u]se of the words 'liar' and 'lie' to characterize disputed testimony when the witness's credibility is clearly in issue is ordinarily not improper unless such use is excessive or is likely to be inflammatory." *Id.* (internal citation omitted). Moreover, it is generally not improper for the prosecution to use the word "lies" to "highlight evidence directly conflicting with the defense's testimony, or to characterize disputed testimony where credibility was clearly an issue, particularly where the prosecutor tied to the pertinent evidence of record each instance in which the defendant supposedly lied." *Shareef*, 190 F.3d at 79.

The government's summation here was in full accord with this precedent. Like in *Coriaty*, many of the prosecutor's references to Henry's dishonesty were tied directly to specific aspects of his testimony. (*See, e.g.*, Tr. 1099 ("So when he took the stand, he said, [']I taught my father how to use Google translate.['] Did Mr. Zheng say that? No. The defendant made that up.").) Other remarks were linked directly to particular documentary evidence, as the court found to be proper in *Shareef*. (*See, e.g.*, Tr. 1124–25 ("The defendant claim[s] that once he believes an export license is required, he doesn't do the business. That's a lie too. . . . he did do it. He did Krayden. He did AR. But there's also Government Exhibit 707 where he's told, [']please note you will probably need an export license for this product to Vietnam.['] And his response. [']Thank you. Your price is our cost plus 10 percent.[']") Lastly, some of the challenged prosecutorial comments referred to Henry's *own* admissions about habitually lying while conducting the business of the Export Company. (Tr. 758–60.) The government's uses of different variations of the word "lie" were tied directly to the defense's case, and were not careless or excessive.

8

Henry also objects to the prosecutor making derogatory comments about his theory of defense. While Henry notes many, if not all, of the comments he considers improper in his supporting memorandum, he appears to take the greatest issue with the following remarks: "it's another lie, and frankly it's offensive," (Tr. 1084); "[d]on't let him get away with it. This is what his fabricated defense basically boils down to," (*Id.*); and "[h]is story is preposterous. It's contrived, it's a made up after the fact trial strategy." (Tr. 1085.) However, "arguing the implausibility of an opponent's theory is one of the tools at the prosecutor's . . . disposal." *United States v. Bonventre*, No. 10-CR-228(LTS), 2014 WL 3673550, at *16 (S.D.N.Y. July 24, 2014); *see also United States v. Rivera*, 971 F.2d 876, 884 (2d Cir. 1992) (finding that the prosecutor's characterization of defense arguments as "ridiculous" was permissible given the evidence presented at trial). Moreover, "courts have rejected the argument that repeatedly questioning the logic of the defense's argument is improper." *Id.*

In short, while the government's closing argument may have been repetitive, it was neither excessive nor inflammatory. It was properly tethered to the testimony and documentary evidence, and appropriately addressed the central issue of Henry's credibility.[5]

## B. Curative Measures

As the Court finds that the remarks at summation were not improper, much less constituted "egregious misconduct," no curative measures were required. As noted, defense

---

[5] The Court is not persuaded by any of the three cases Henry cites for comparison. Though it is true that the prosecutor in *Floyd v. Meachum*, 907 F.2d 347 (2d Cir. 1990) used a variation of the term "lie" 40 times, compared to 55 times here, the Court does not find this language improper when viewed in context. Moreover, the sheer number of uses of that word was not the only basis for reversal in *Floyd*. The Second Circuit took care to emphasize that the reversal was instead based on the cumulative effect of various types of improper remarks, escalating from opening statement to closing argument, as well as inappropriate references to the Fifth Amendment and vouching for a critical government witness. The other two cases Henry cites, *United States v. Gonzalez*, 488 F.2d 833 (2d Cir. 1973), and *United States v. Drummond*, 481 F.2d 62 (2d Cir. 1973), involved a consistent pattern of repeated misconduct by the *same* prosecutor, who was known by the court for his inappropriate behavior. In both cases, the Second Circuit reversed for a multitude of reasons beyond just the prosecutor's remarks; the reversal in *Gonzalez* was based partly on inadequate jury instructions, while the reversal of *Drummond* was compelled by improper bolstering and prosecutorial misstatements of testimony. No equivalent conduct is present here.

counsel did not register any objections to the remarks about which Henry now complains, and any objections that might have been offered would have been overruled. Without any objections being offered, the Court was not even provided an opportunity to cure. Defense counsel also failed to request specific jury instructions, limiting further any ability he had to complain about a lack of curative measures. *See United States v. Melendez*, 57 F.3d 238, 242 (2d Cir. 1995) (citing Fed R. Crim. P. 30). Nevertheless, the Court instructed the jury that the arguments or statements of the lawyers were not to be considered evidence. This instruction reinforced that the *jurors*, not the prosecutor, remained the sole arbiters of Henry's truthfulness. Where there was no misconduct, this instruction was proper and sufficient. *Cf. Elias*, 285 F.3d at 192 (finding that a similar instruction was sufficient to cure moderate misconduct).

### C. Certainty of Conviction

The trial record indicates that Henry would have been convicted even without the prosecutor's repeated references to his lies and deception. As in *Modica*, the defendant's story here was "so inherently implausible" that the Court finds it extremely unlikely the jury would have accepted it. *United States v. Modica*, 663 F.2d 1173, 1182 (2d Cir. 1981).

Accordingly, given the lack of prosecutorial misconduct, as well as the likelihood of conviction even absent any allegedly improper remarks, the Court finds that the government's closing argument did not result in substantial prejudice to the defendant or deprive him of his right to a fair trial. There was no manifest injustice here, and Henry's motion for a new trial on this basis is therefore DENIED.

### D. Ineffective Assistance of Counsel

Where, as here, there is no prejudicial error in the government's summation, defense counsel's failure "to raise an otherwise futile objection could not have rendered counsel

10

ineffective." *United States v. Cohen*, 427 F.3d 164, 170 (2d Cir. 2005).[6] Furthermore, because the Court does not find that the government's comments at summation were improper, it would be hard-pressed to find not only that Henry's trial counsel's failure to object during summation was objectively unreasonable, but that it was prejudicial and would have changed the outcome. *See Strickland v. Washington*, 466 U.S. 668, 688 (1984). As previously stated, because the case against Henry was so strong, it is unlikely that any failure to object, especially to conduct the Court finds to be proper, would have prejudiced the outcome of the trial. In short, defense counsel's failure to object at summation does not qualify as ineffective assistance of counsel, and Henry's motion for a new trial on this basis is therefore DENIED.

## CONCLUSION

For the reasons stated above, Henry's motion for a new trial (Doc. No. 70) is **DENIED**.

SO ORDERED.

Dated: Brooklyn, New York
February 26, 2015

s/Roslynn R. Mauskopf
_____
ROSLYNN R. MAUSKOPF
United States District Judge

---

[6] The Court adds that it carefully observed defense counsel throughout the pre-trial and trial proceedings, and found him to be both a skillful and zealous advocate for his client. Indeed, despite powerful evidence of guilt, counsel was able to obtain an acquittal for Henry on one of the three counts, a reflection that Henry received the effective representation to which he was entitled.

11